# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

APOTHECARY ARTS PHARMACY INC.
d/b/a AURORA COMMUNITY PHARMACY,
  et al.,

      Plaintiffs,

    v.

ALBERTO R. GONZALES, et al.,

      Defendants.

CIV. NO. _____

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFFS' MOTION FOR A
## PRELIMINARY INJUNCTION

Douglas J. Behr, (D.C. Bar No. 163998)
KELLER AND HECKMAN LLP
1001 G Street, N.W.
Washington, DC  20036
(202) 434-4100

Attorney for Plaintiffs
Apothecary Arts Pharmacy Inc. and
City View Pharmacy

Dated: January  23, 2006

## PRELIMINARY STATEMENT

To prevent irreparable harm to their businesses pending an administrative adjudication not likely to be final for at least a year from now, and to protect their constitutional right to due process, Apothecary Arts Pharmacy Inc. d/b/a Aurora Community Pharmacy ("Aurora") and City View Pharmacy ("City View") (each a "Plaintiff" and collectively "Plaintiffs") seek to preliminarily enjoin and dissolve the Drug Enforcement Administration's ("DEA") immediate suspension of Plaintiffs' DEA Certificates of Registration BA9116395 and BC7177694 (each s "Registration" and collectively "Registrations") to dispense controlled substances.

Plaintiffs are retail pharmacies located in the Denver, Colorado area. On September 21, 2005, DEA served each Plaintiff with an Order to Show Cause and Immediate Suspension of Registration ("Show Cause Order") without prior notice or opportunity to defend. The Show Cause Orders were based on plaintiffs' involvement in filling prescriptions issued by physicians associated with Internet websites. The immediate suspension of Plaintiffs' registrations was based on the DEA's assertion that the Plaintiffs' continued registration allegedly constituted "an imminent danger to the public health and safety."

Neither the statute nor regulations under which DEA suspended Plaintiffs' Registrations without prior notice provides for a prompt post-suspension review of that suspension. Rather, the statute and regulations provide for an adjudication of the Order to Show Cause Why the Registration should not be revoked which likely will take at least a total of twenty (20) months.

Plaintiffs requested an expedited hearing within thirty (30) days on the Show Cause Orders, in accordance with the notice of suspension. However, the DEA Administrative Law Judge assigned to Plaintiffs' cases advised that such an expedited hearing was "not possible." A

hearing has been scheduled which will conclude at the end of May, 2006. However, the hearing results only in a report and recommendation to the DEA Administrator who must then rule on the Show Cause Order.

The adjudication of the Show Cause Orders will likely not take place before at least twenty months from the date of the immediate suspension. The failure of DEA to provide Plaintiffs with a prompt post-suspension adjudication violates their due process rights and requires the issuance of the requested preliminary injunction.

## STATEMENT OF FACTS

### I. Regulatory Overview

The Controlled Substances Act ("CSA") was enacted as Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970. The CSA forms the basis for federal government regulation of the manufacture, importation, possession, and distribution of certain drugs. Subchapter I, Part C of the CSA governs the registration of manufacturers, distributors, and dispensers of controlled substances.

Under the CSA, the Attorney General "shall register" any pharmacy that is authorized to dispense controlled substances under state law. 21 U.S.C. § 823(f). The Attorney General may only deny an application after notice and hearing upon a finding that "such registration would be inconsistent with the public interest" through the consideration of five factors set forth in the statute. *Id.*

Once issued, a registration may be suspended or revoked by the Attorney General if the registrant "has committed such acts as would render his registration . . . inconsistent with the

3

public interest as determined under 21 U.S.C. § 823." 21 U.S.C. § 824(a)(4). Before taking

action to revoke a registration, however, the Attorney General must serve upon the registrant an

order to show cause why registration should not be revoked or suspended. 21 U.S.C. § 824(c); 21

C.F.R. § 1301.36(d). The order to show cause must contain a statement of the basis and direct

the registrant "to appear before the Attorney General at a time and place stated in the order, but

in no event less than thirty days after the date of receipt of the order." *Id.* The Attorney General

may immediately suspend a registration "in cases where he finds that there is an imminent

danger to the public health or safety." 21 U.S.C. § 824(d); 21 C.F.R. § 1301.36(e). Pursuant to

statute, "a suspension . . . shall continue in effect until the conclusion of such [revocation]

proceedings, including judicial review thereof, unless sooner withdrawn by the Attorney General

or dissolved by a court of competent jurisdiction." 21 U.S.C. § 824(d); 21 C.F.R § 1301.36(h).

Neither the CSA, nor DEA's regulations, provide for a post-suspension review of an immediate

suspension. Rather, under DEA's regulations, the Administrator "shall" grant the request for an

earlier hearing on the Show Cause Hearing and fix a date "as early as reasonably possible" if

requested. 21 C.F.R. §1301.36(h). No other special provisions exist relating to hearings in this

circumstance and the regulations do not require a final decision within any specified timeframe.

Hearings on orders to show cause are conducted by an Administrative Law Judge

("ALJ"). Currently, DEA employs only two ALJs. DEA ALJ's are responsible for holding

hearings on denials and revocations of registrations for manufacturers, distributors, physicians

and pharmacies relating to controlled substances; denials and revocations of manufacturers and

distributors of listed chemicals and hearing contesting the registrations of importers of narcotic

4

raw materials. DEA's regulations do not establish any precedence for hearing where suspensions have been issued.

DEA has held that

> it is the principal function of a hearing to provide information sufficient for an administrator to determine the course to follow. A second function of the hearing is to assist the administrator through the recommendation of an administrative law judge as to the action deemed appropriate by the judge. This recommendation is entitled to the highest respect and fullest consideration.

In the Matter of Lincoln Eramo, M.D., 42 Fed. Reg. 61,336 (Dec. 2, 1977).

After testimony has been taken, the ALJ generally requests and receives from the parties proposed findings of fact and conclusions of law approximately six weeks later. Thereafter, the ALJ formulates and publishes an opinion and recommended ruling. *E.g.*, Dan E. Hale, D.O., 69 Fed. Reg. 69,402 (Nov. 29, 2004); Rosalind A. Cropper, M.D., 66 Fed. Reg. 41,010 (Aug. 6, 2001). Each party then has twenty days to file exceptions to the Opinion and Recommendation. 21 C.F.R. § 1316.66 (2004). The ALJ's recommendations, along with the exceptions, if any, are then transmitted to the DEA official to whom responsibility has been delegated to make a decision, generally a Deputy Administrator. The Administrator's choices include maintaining the registration with or without limitations, revoking the registration, and fully or partially suspending the registration. *See Pearce v. U.S. Dept. of Justice*, 867 F.2d 253, 256 (6th Cir. 1988); 21 U.S.C. § 824(b).

The Administrator is required by regulation to make her decision "as soon as practicable after the presiding officer has certified the record to the Administrator." 21 C.F.R. § 1316.76. The entire process from show cause to final order recently has taken, on average, over two years.

5

The two most recent decisions by the Administrator were issued 18 and 22 months after service of the Order to Show Cause. *See* Donley D. Siddell, M.D., 70 Fed. Reg. 76,868 (Dec. 28, 2005) (show cause served June 28, 2004; ALJ Recommendation to grant DEA summary judgment issued Nov. 4, 2004, Administrator's decision Dec. 28, 2005), and Joey Enterprises, Inc. d/b/a NorthStar Wholesale, 70 Fed. Reg. 76,866 (Dec. 28, 2005) (show cause served March 2, 2004; Administrator's decision December 28, 2005).

## II.    The Immediate Suspension of Plaintiffs' Registrations and Subsequent Proceedings on the Show Cause Order.

On or about September 21, 2005, DEA served each Plaintiff with an Order to Show Cause and Immediate Suspension of Registration. See Attachment A to Declaration of Robin Hyman ("Hyman Decl."), attached hereto as Exhibit 1; Attachment A to Declaration of Sue Longo ("Longo Decl."), attached hereto as Exhibit 2.[1]  Simultaneously, DEA seized all controlled substances on Plaintiffs' premises. Hyman Decl., Ex. 1, ¶ 5 ($163,140 worth); Longo Decl., Ex. 2, ¶ 5 ($35,252 worth).  The Show Cause Orders notified Plaintiffs that they had 30 days to file a written request for a hearing.  The Show Cause Orders further stated:

> If you request an expedited hearing pursuant to 21 C.F.R. §
> 1301.36(h), such hearing will be held at 600 Army-Navy Drive,
> Arlington, Virginia, thirty (30) days after the date on which your
> written request is received by the Office of Administrative Law
> Judges, Drug Enforcement Administration, Washington, D.C.
> 20537.  The date and location may be changed by the
> Administrative Law Judge responsible for the case, after notice and
> consultation with the parties, and will be fixed as early as is
> reasonably possible. (*See* 21 C.F.R. §§ 1301.36(h), 1301.43(a)).

---

[1]    Plaintiff's have attached copies of both Declarations and will provide the original versions as soon as possible.

6

Attachment A to Hyman Decl., Ex. 1, p. 7; Attachment A to Longo Decl., Ex. 2, p. 9.

On October 21, 2005, Plaintiffs filed their requests for expedited hearings with the Office of Administrative Law Judges.

On October 25, 2005, ALJ Mary Ellen Bittner issued an Order for Prehearing Statements in each of Plaintiffs' cases. Attachment A to Declaration of Douglas J. Behr, Esquire ("Behr Decl."), attached hereto as Exhibit 3. Judge Bittner ordered the government to file its prehearing statement on November 15, 2005 and Plaintiffs to file their prehearing statements on December 6, 2005. In her Order, Judge Bittner "advised" counsel "that it is not possible to hold the hearing in this matter on November 20, 2005, thirty days from the date Respondent's request for hearing was filed in the Office of Administrative Law Judges. Consequently, the date of the hearing will be set subsequent to the filing of prehearing statements." *Id.*

The prehearing statements were filed as ordered.

On December 20, 2005, Judge Bittner scheduled a telephone conference for January 18, 2006. Attachment B to Behr Decl., Ex. 3. At that conference, a hearing on the Orders to Show Cause was scheduled to for March 21 – 23, April 25 – 27 and May 23 – 25, 2006. *Id.*, ¶ __

## LEGAL BACKGROUND

### I. Preliminary Injunction

A preliminary injunction is available in this Circuit when the Plaintiff demonstrates: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that no other parties will be harmed if temporary relief is granted; and (4) that the public interest favors a preliminary injunction. *Nat'l Treasury*

*Employees Union v. United States,* 927 F.2d 1253, 1254 (D.C. Cir. 1991); *Sea Containers, Ltd. v.*

*Stena AB,* 890 F.2d 1205, 1208 (D.C. Cir. 1989); *Wash. Metro. Area Transit Comm'n v. Holiday*

*Tours,* 559 F.2d 841, 943 (D.C. Cir. 1977); *Va. Petroleum Jobbers Ass'n v. Federal Power*

*Comm'n,* 259 F.2d 921, 925 (D.C. Cir. 1958). A Plaintiff is not required to prevail under each of

these factors; rather, "the factors must be viewed as a continuum, with more of one factor

compensating for less of another." *Bracco Diagnostics, Inc. v. Shalala,* 963 F. Supp. 20, 27

(D.D.C. 1997). Indeed, "[a] stay may be granted with either a high probability of success and

some injury, or *vice versa.*" *Cuomo v. U. S. Nuclear Regulatory Comm'n,* 772 F.2d 972, 974

(D.C. Cir. 1985). In this case, however, each factor strongly favors the award of injunctive

relief.

## II. Due Process Right to an Expedited Post-Suspension Adjudication

The Fifth Amendment to the Constitution of the United States provides that no person

may be deprived of life, liberty, or property without due process of law. The "fundamental

requirement" of due process is the "opportunity to be heard at a meaningful time and in a

meaningful manner." *Beverly Enterprises, Inc. v. Herman*, 130 F. Supp. 2d 1, 17 (D.D.C. 2000)

(citing *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976)). To establish an actionable due process

claim, the plaintiff must show that "(1) it has a protected interest, (2) the government deprived it

of this interest, and (3) the deprivation occurred without proper procedural protections." *PDK*

*Labs Inc. v. Reno,* 134 F. Supp. 2d 24, 32 (D.C. Cir. 2001). *See also, Beverly Enterprises*, 130 F.

Supp. 2d at 17 *(citing Propert v. District of Columbia,* 948 F.2d 1327, 1331 (D.C.Cir. 1991);

*Soeken v. Herman,* 35 F. Supp. 2d 99, 104-105 (D.D.C.1999)). In determining how much

protection is warranted, the court balances the following three factors: (1) the plaintiff's

protected interest that will be affected by the government's action; (2) the risk of erroneous

deprivation of the plaintiff's protected interest under the disputed procedures; and (3) the

government's interest. *Gilbert v. Homar,* 520 U.S. 924, 931-932 (1997) (quoting *Mathews v.*

*Eldridge,* 424 U.S. 319, 335 (1976)); *Beverly Enterprises*, 130 F. Supp. 2d at 17 *(citing Kropat v.*

*FAA,* 162 F.3d 129, 132-33 (D.C.Cir.1998)).

   This court has acknowledged that even the temporary suspension of a constitutionally

protected interest amounts to a serious deprivation when the suspension is permitted by statute to

remain in effect until the underlying matter is finally disposed of or terminated, *see Feinberg v.*

*FDIC,* 420 F. Supp. 109 (D.D.C. 1976), and several other courts have found the duration of any

potentially wrongful deprivation of a property interest an important factor in assessing the impact

of government action on a private interest. Those courts have upheld the constitutionality of

temporary suspensions without a hearing when the relevant statutes or procedures provided for a

"prompt" post-suspension hearing. *See Gilbert v. Homar,* 520 U.S. 924, 935 (1991); *Cf.,*

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985) ("At some point, a delay in the

post-termination hearing would become a constitutional violation."). A post-suspension hearing,

where no pre-suspension hearing occurred, has generally been found to be sufficiently prompt

when it has concluded within ninety (90) days of the petitioner's request for hearing. *See e.g.,*

*FDIC v. Mallen,* 486 U.S. 230 (1988); *Delahoussaye v. Seale,* 788 F.2d 1091 (5th Cir. 1986); *Air*

*East, Inc. v. NTSB,* 512 F.2d 1227 (3rd Cir. 1975). The failure of a statute to specify any time

period for a post-suspension hearing has been found to be particularly problematic and

constitutionally infirm under the due process clause. *Barry v. Barchi,* 443 U.S. 55, 66 (1979);

*see also, Feinberg v. FDIC*, 420 F. Supp. 109 (D.D.C. 1976).

9

## ARGUMENT

The CSA and the DEA's regulations implementing the statute are constitutionally deficient because they fail to assure the prompt post-suspension hearing required by due process. Rather, the CSA requires that any such suspension remain in effect until the Agency adjudicates the accompanying Order to Show Cause and all appeals are resolved. DEA's regulations merely indicate that a registrant whose registration has been immediately suspended may request an expedited hearing on the Order to Show Cause that will be fixed "as early as reasonably possible." In practice, however, a truly expedited hearing is not "reasonably possible." Even if such a hearing were possible, the final adjudication of the Show Cause Order takes at least a year. Therefore, the immediate suspension of Plaintiffs' Registrations was constitutionally infirm under the Due Process Clause of the Fifth Amendment, and Plaintiffs are entitled to an injunction to enjoin Defendants from suspending their Registrations pending the issuance of final agency action on the suspensions.

### A.     Plaintiffs Are Substantially Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits of their due process claims. Plaintiffs have been denied "the fundamental requirement of due process," which is "the opportunity to be heard at a meaningful time and in a meaningful manner." *Beverly Enterprises, Inc. v. Herman*, 130 F. Supp. 2d 1, 17 (D.D.C. 2000) (citing *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976)). Where, as here, no pre-suspension hearing was provided, a prompt post-suspension adjudication is required. That has not, and will not, occur.

10

Plaintiffs have a constitutionally protected life, liberty, or property interest, and the procedures employed by the government deprived Plaintiffs of that interest without constitutionally adequate procedures. *Beverly Enterprises*, 130 F. Supp. 2d at 17 *(citing Propert v. District of Columbia.,* 948 F.2d 1327, 1331 (D.C.Cir.1991); *Soeken v. Herman,* 35 F. Supp. 2d 99, 104-105 (D.D.C. 1999)).

First, Plaintiffs have a protected property interest in their DEA Certificates of Registration. *See Harline v. DEA,* 148 F.3d 1199, 1204 (10th Cir. 1998) (noting that the DEA did not dispute that a licensed physician has a property interest in his DEA registration to prescribe controlled substances and a liberty interest in practicing medicine); *Ritter v. Cohen*, 797 F.2d 119, 122 (3rd Cir. 1986) (property interest in continued participation in state Medicaid program). DEA granted Plaintiffs their registrations. Those registrations are of utmost importance to Plaintiffs' businesses because the filling of prescriptions for controlled substances affects a significant percentage of a pharmacy's business. *See* Hyman Decl, Ex. 1, ¶ 6; Longo Dec., Ex. 2, ¶ 6. Patients generally will not patronize a pharmacy that cannot fill all of their prescriptions. Finally, customers who fill prescriptions at a pharmacy generally purchase other products as well thereby increasing the pharmacy's revenue even further. Plaintiffs may not be deprived of their property interests in their Certificates of Registration without due process.

Plaintiffs also have a "liberty interest in avoiding the damage to . . . [their] reputation and business[es] caused by a stigmatizing suspension." *PDK Labs Inc. v. Reno*, 134 F. Supp. 2d 24, 33 (D.D.C. 2001) (quoting *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993); *see also, Harline v. DEA,* 148 F.3d 1199, 1204 (10th Cir. 1998). DEA's press release related to the immediate suspensions resulted in negative press about Plaintiffs and

11

plaintiffs' suspension has cause embarrassment in dealing with customers and local physicians. Hyman Decl., Ex. 1, ¶ 7; Longo Decl., Ex. 2, ¶ 7.

Second, there is no doubt that DEA has deprived Plaintiffs of their property interest. DEA summarily suspended Plaintiffs' DEA registrations and those suspensions will continue indefinitely without review.

Finally, Plaintiffs likely will demonstrate that the deprivation of their property rights occurred without the proper procedural safeguards or protections. Due process clearly requires a prompt post-suspension adjudication in cases where there has not been a pre-suspension hearing. The statute and regulations under which DEA has acted provide no such hearing. In fact, under that statute and regulations, Plaintiffs must wait for an adjudication of the Show Cause Orders which will not be completed for at least another year. The suspensions will continue in effect for the entire time. 21 U.S.C. § 824(d); 21 C.F.R. § 1301.36(h).

Where, as here, there is no provision for a prompt adjudication of the immediate suspension, the statute is unconstitutional and the suspension must be set aside. *See Barchi,* 443 U.S. at 66; *Feinberg v. FDIC,* 420 F. Supp. 109 (D.D.C. 1976). *See also, FDIC v. Mallen,* 486 U.S. 230 (1988) (finding a hearing on the suspension of an indicted bank official "sufficiently prompt" because the relevant statute required the FDIC to hold a hearing within thirty days of a written request and notify the suspended officer of its decision within sixty days of the hearing); *Delahoussaye v. Seale,* 788 F.2d 1091 (5th Cir. 1986) (concluding that a pre-hearing grain warehouse license suspension did not violate due process because the statute required a prompt post-deprivation hearing within ten days of the suspension); *Air East, Inc. v. National Transportation Safety Board,* 512 F.2d 1227 (3rd Cir. 1975) (acknowledging that the suspension

12

of a business is a "grave matter which should not be treated lightly," but finding no due process violation because the emergency revocation was limited by statute to sixty days, and an appeal had to be decided within that time period).

Even if the statute itself is not unconstitutional on its face, DEA's practice is. DEA does not provide any expedited, post-suspension review of the immediate suspension. Rather, DEA requires Plaintiffs to litigate the Order to Show Cause over an extended period of time exceeding twelve months while Plaintiffs' registrations remain suspended which clearly violates Plaintiffs' due process rights.

## II.    Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief

The immediate suspension of Plaintiffs' Registrations threatens the very existence of Plaintiffs' businesses. The suspension prohibits Plaintiffs from filling prescriptions for *any* controlled substance, whether to Internet customers or to customers who fill prescriptions directly with the pharmacies. Aurora estimates that it has lost nearly $1,100 in prescription sales each day since the immediate suspension. Hyman Decl., Ex. 1, ¶ 6. Aurora also lost a contract with a local hospital for which it had purchased a $20,000 machine that is now going unused. *Id.* One couple that filled 14 prescriptions a month at Aurora no longer patronizes the store. Id., ¶ 7. City View estimates that it has lost approximately $102,608 in pharmacy sales, or $38,753 in net profit, since the immediate suspension. Longo Decl., Ex. 2, ¶6. Plaintiffs are irreparablely harmed by these losses because the government is immune from damage suits. *See Woerner*, 739 F. Supp. at 650; *Wisconsin v. Stockbridge-Munsee Cmty.*, 67 F. Supp. 2d 990, 1019-20 (E.D. Wis. 1999); *Glendale Neighborhood Ass'n v. Greensboro Housing Auth.*, 901 F. Supp. 996, 1002 (M.D.N.C. 1995). Plaintiffs have suffered, and will continue to suffer, monetary loss on account

13

of the suspensions, which they will never be compensated for. The repercussions of the "temporary" suspensions are severe, and the suspension of Plaintiffs' Registrations should not be treated lightly.

Plaintiffs have also suffered grave harm to their reputations on account of the stigma associated with the suspensions. Hyman Decl., Ex. 1, ¶ 7; Longo Decl., Ex. 2, ¶ 7.

Finally, the deprivation of a constitutional right "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

### III.    There Is No Cognizable Harm to Others

The immediate suspensions not only harmed Plaintiffs but they also harmed the community. Each plaintiff is a neighborhood pharmacy that has special relationships with doctors, treatment facilities and patients in their area that have been damaged due to the suspensions. For instance, psychiatric patients who had patronized City View because it was close, familiar and extended them credit, can no longer have their prescriptions filled there. Longo Decl., Ex. 2, ¶ 8. Additionally, Aurora can no longer act as the back up supply of controlled substances for a local emergency room and, on at least one occasion, that absence resulted in the cancellation of a surgery. On the other hand, DEA will suffer no cognizable harm as a result of an injunction imposed on account of its violation of due process.

Nor will the public be harmed by an injunction. The DEA asserted in the Show Cause Orders that an "imminent danger to the public health and safety [existed] because of the substantial likelihood that [Aurora and City View] will continue to divert controlled substances to drug abusers." However, Aurora had stopped filling Internet prescriptions prior to the suspension. Furthermore, on October 2, 2005, a Colorado Pharmacy Board regulation went into

14

effect that prohibits the filling of prescriptions issued solely upon the patient's completion of an

internet questionnaire. Colorado State Board of Pharmacy Rule 3.00.21.[2] Thus, Plaintiffs are

prohibited by state law from filling the prescriptions to which DEA objected. Additionally, both

Plaintiffs are prepared to accept a limitation on their registrations that prohibits filling

prescriptions transmitted to them over the Internet.

### IV.    The Public Interest Strongly Favors Granting Injunctive Relief

As a general matter, "there is a strong public interest in meticulous compliance with law

by public officials." *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993). Whereas

the DEA has claimed a public interest associated with suspending Plaintiffs' Registrations, the

public interest is served by requiring an agency to act lawfully. Other government agencies and

other persons who manufacture, distribute, dispense, import, or export controlled substances

subject to the CSA and applicable DEA regulations will benefit if the DEA is required to conduct

its business in a fair and unbiased manner in accordance with the constitution. *See Woerner*, 739

F. Supp. at 650.

Injunctions also serve the public interest "by preserving the Plaintiffs' right to meaningful

judicial review." *Ugine-Savoie Imphy v. United States.*, 24 Ct. Int'l Trade 1246, 1252, 121 F.

Supp. 2d 684, 690 (Ct. Int'l Trade, 2000). In this instance, Plaintiffs will be stripped of any

meaningful judicial review because the economic impact of the suspensions will be immediately

---

[2] The regulation provided: "A pharmacist shall make every reasonable effort to ensure that any order, regardless of the means of transmission, has been issued for a legitimate medical purpose by an authorized practitioner. A pharmacist shall not dispense a prescription drug if the pharmacist knows or should have known that the order for such drug was issued on the basis of an internet-based questionnaire, an internet-based consultation, or a telephonic consultation, all without a valid preexisting patient-practitioner relationship."

crippling to the company. An injunction will prevent the catastrophic loss associated with further postponement of Plaintiffs' interest in conducting its operations in the ordinary course of business.

## CONCLUSION

For the reasons stated above, Apothecary Arts Pharmacy Inc. d/b/a Aurora Community Pharmacy and City View Pharmacy respectfully request the issuance of a Preliminary Injunction in the form submitted with this Motion.

Dated: January 23, 2006

Respectfully submitted,

By: _____
Douglas J. Behr (D.C. Bar No. 163998)
Keller and Heckman LLP
1001 G Street NW, Suite 500
Washington, DC 20001
(202) 434-4200

Attorney for Plaintiffs Apothecary Arts Pharmacy Inc. and
City View Pharmacy

16

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTHECARY ARTS PHARMACY INC.<br>d/b/a AURORA COMMUNITY PHARMACY,<br> et al.,<br><br>              Plaintiffs,<br><br>                   v.<br><br>ALBERTO R. GONZALEZ,  et al.,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   CIV. NO. _____<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF ROBIN HYMAN

### Pursuant to 28 U.S.C. §1746

I, Robin Hyman, do hereby declare that the following facts are true and accurate:

1.   I am a registered pharmacist, licensed in the states of Colorado and Georgia.  My license number in Colorado is #15339.  I have been a pharmacist since 1997.

2.   I am the sole owner of the Aurora Community Pharmacy (Aurora) which is located at: 1411 S. Potomac St., Suite #190, Aurora, CO  80012.  I purchased the store in February, 2005.

3.   Aurora holds DEA Certificate of Registration BA9116395. Aurora holds a retail pharmacy license PDO-70000034 from the State of Colorado and is authorized under state law to dispense controlled substances.

4.   On September 21, 2005, I was served with an Order to Show Cause and Immediate Suspension of Registration ("Show Cause Order").  At that time, I was not filling internet prescriptions, having stopped in mid-August after only sixty four days or so of sales.

5.    The total value of the controlled substances taken by the DEA on September 21, 2005 is
       $163,140.11.

6.    My pharmacy has lost nearly $1,100 in prescription sales every day since the suspension.
       My total volume of prescriptions has dropped from roughly 100 non-internet
       prescriptions a day prior to the suspension to an average of around 40 a day now.  In
       addition, I was finalizing a contract with the University Hospital to compound various
       Intrathecal drugs which would be used in patients with implanted pain pumps.  This
       contract is now on hold, and the machinery I bought for this work, which costs about
       $20,000, is not being used.

7.    DEA's press release relating to the immediate suspensions resulted in negative press
       about the pharmacy and has caused embarrassment in dealing with customers and local
       physicians.  In addition, under Colorado law, I must now contact physicians every time
       there is a written prescription I can fill for non-controlled substances and take a verbal
       order  to copy the written prescription and fill it.  For any controlled
       substances, I must inform the patient that they have to go elsewhere for service,
       document that I filled the non controlled medications from the prescription after I have
       obtained the hard copy from the physician's office and return the original prescription
       back to the patient.  One couple that used to bring me an average of 14 prescriptions a
       month has now taken their  business elsewhere. I have lost all the pain business I
       provided for patients at the Rocky Mountain Cancer Center across the street. Many
       patients have taken their business elsewhere because I am unable to compound the pain
       medication they need.  Professionally, this has been very damaging.

8.    Many local hospitals and clinics have been adversely affected by my suspension.
       Primarily the emergency room of the Medical Center of Aurora, to which my pharmacy

- 2 -

is attached, and the Aurora Urgent Care Clinic must now send patients to other pharmacies to have their prescriptions filled. I am no longer able to provide the stock needed for the Aurora Urgent Care Clinic and they must go to another town to get their controlled medications for the clinic. I also had a very beneficial relationship with a Spinal and Orthopedic clinics which are in the same building where my pharmacy is. They liked having a pharmacy near by so that they could monitor their patients closely. After my suspension, they have had to send patients to other pharmacies where their relationship is not as strong.  Most importantly though, I was used as a back up supply source for a local surgery center, and on at least one occasion, they have had to cancel surgery since I could not supply them with the controlled substances they needed.

I HEREBY DECLARE under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2006

Robin Hyman

- 3 -

# ATTACHMENT A



U.S. Department of Justice
Drug Enforcement Administration

---

*www.dea.gov*                                      Washington, D.C. 20537
                                                   [SEP 1 9 2005

IN THE MATTER OF

Aurora Community Pharmacy
1411 S. Potomac #190
Aurora, Colorado 80012

### ORDER TO SHOW CAUSE AND
### IMMEDIATE SUSPENSION OF REGISTRATION

PURSUANT to Sections 303 and 304 of the Controlled Substances Act, Title 21, United States Code, Sections 823 and 824,

NOTICE is hereby given to inform Aurora Community Pharmacy ("Aurora") of the immediate suspension of Drug Enforcement Administration (DEA) Certificate of Registration, BA9116395, because such registration constitutes an imminent danger to the public health and safety pursuant to 21 U.S.C. § 824(d). Notice is also given to afford Aurora an opportunity to Show Cause before the DEA, at a place and time to be determined, as to why DEA should not revoke such registration pursuant to 21 U.S.C. § 824(a)(4), and deny any pending applications for renewal or modification of such registration pursuant to 21 U.S.C. § 823(f), for reason that continued registration is inconsistent with the public interest, as that term is used in 21 U.S.C. § 823(f) and § 824(a)(4), as evidenced by, but not limited to, the following:

1. The Controlled Substances Act (CSA) establishes a "closed system" of distribution that regulates the movement of controlled substance prescription medications from importation or manufacture through their delivery to the ultimate user-patient via the dispensing, administering or prescribing pursuant to the lawful order of a practitioner. The regulations implementing the CSA explicitly describe the parameters of a lawful prescription as follows:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

21 C.F.R. § 1306.04(a).

2. Prescriptions that are not issued in the "usual course of professional practice" are not prescriptions for purposes of the CSA, and individuals issuing and filling such purported prescriptions are subject to penalties for violating the CSA's controlled substances provisions.

3. In *United States v. Moore*, 423 U.S. 122, 141 (1975), the Supreme Court held that, "[i]mplicit in the registration of a physician is the understanding that he is authorized only to act 'as a physician'." "Acting as a physician" is acting "in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." *Id.* at 139.

4. In a traditional setting, a legitimate doctor-patient relationship usually consists of:

    a. Face-to-face evaluation of the patient by the doctor;
    b. Discussion of symptoms;
    c. Examination of the patient's current physical condition;
    d. Obtaining a reliable patient medical history and consideration of the patient's family medical history;
    e. Performance of any needed laboratory or medical tests;
    f. Proper diagnosis of the health problem and identification of underlying conditions and/or contraindications to the treatment recommended/provided;
    g. Sufficient dialogue with the patient regarding treatment options, and the risks and benefits of those treatments and the use of prescription drugs;
    h. Determination of appropriate therapy;
    i. Consideration of possible adverse side effects or drug contraindications;
    j. Prescribing of medically appropriate medications;
    k. Monitoring the efficacy of the medications prescribed and, when appropriate, re-evaluation of the diagnosis and course of treatment; and
    l. Maintenance of contemporaneous, complete and accurate medical records that are readily available to the patient and, subject to the patient's consent, to his or her other health care professionals, to facilitate patient management and care.

5. The CSA regulations create certain responsibilities not only on individual practitioners who issue prescriptions for controlled substances, but also on pharmacists who fill those prescriptions. A pharmacist's "corresponding responsibility" regarding the proper dispensing of controlled substances is explicitly described in 21 C.F.R. § 1306.04(a). It provides:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

2

6. The National Association of Boards of Pharmacy considers Internet pharmacies to be suspect if:

> [t]hey dispense prescription medications without requiring the consumer to mail in a prescription, and if they dispense prescription medications and do not contact the patient's prescriber to obtain a valid verbal prescription. Further, online pharmacies are suspect if they dispense prescription medications solely based upon the consumer completing an online questionnaire without the consumer having a pre-existing relationship with the prescriber and the benefit of an in-person physical examination. State boards of pharmacy, boards of medicine, the FDA, as well as the AMA, condemn this practice and consider it to be unprofessional.

*http://www.nabp.net/vipps/consumer/faq.asp.*

7. DEA has learned that Internet Facilitation Centers (IFCs) join illicit drug-seekers with physicians who will illegitimately prescribe controlled substances, and pharmacists who will fill sham prescriptions. Drug-seekers purchase self-selected controlled substances on Internet websites after entering their mailing and payment information, and cursory descriptive information such as their height, weight, and age. The customer's delivery address and controlled substance-of-choice is electronically forwarded to the IFC. The IFC in turn electronically provides the basic information to one of many roster physicians, who then electronically authorizes an order for the customer-selected controlled substance. No mechanism provides for face-to-face consultation between the physician and the customer, or an opportunity for medical evaluation or diagnosis. The IFCs enlist pharmacies such as Aurora to fill the electronic drug orders. Pharmacies retrieve the drug orders by electronically downloading physicians' electronic authorizations and the customers' delivery instructions. The pharmacy mails the customer-selected controlled substance to the drug-seeker via Federal Express or UPS. Once the IFC receives payment from the customer, the IFC pays the roster physician based upon the number of drug orders authorized, and the IFC pays the pharmacies based on the number of drug orders filled. A typical 90-day supply of controlled substance drug order retails on the Internet for approximately $300, of which the IFC retains approximately $200.

DEA has learned that Aurora is owned by Apothecary Arts Pharmacy, Inc. Robin Hyman is a registered pharmacist, and is the President, Treasurer, and Secretary of Apothecary Arts Pharmacy, Inc. RPh Hyman assumed ownership and pharmacist duties of Aurora in February, 2005. In May 2005, Aurora began participating in two Internet operations similar to the one described above, and fills approximately 300-700 Internet drug orders per day. The first IFC, *www.ndapharmacy.com*, pays Aurora $7.00 for each filled drug order. The second IFC, *www.discountmedsource.com*, pays Aurora $10.00 for each filled drug order. By July 1, 2005, Aurora had received at least $17,488.27 for its role in the Internet operations of one IFC, and by July 5, 2005, Aurora had received least $95,504.30 for its role in the Internet operations of the second IFC.

3

8. When the established safeguards of an authentic doctor-patient relationship are lacking, controlled substance prescription drugs cannot only be misused, but also present potentially serious health risks to patients. Illegally operated Internet pharmacies circumvent legitimate medical practice. A federal investigation revealed that Aurora dispenses controlled substances to Internet customers despite substantial evidence that the customers do not enjoy doctor-patient relationships with the prescribing physicians. For example, Aurora fills numerous prescriptions that are authorized by the same physician, on the same day, for multiple Internet customers who do not reside in the state in which the physician resides; Aurora fills inordinately large quantities of prescriptions per day, per physician; and the prescriptions are for disproportionate amounts of one or two types of highly addictive and abused controlled substances. These facts alone put Aurora on notice that it is dispensing controlled substances pursuant to prescriptions written outside the bounds of legitimate professional practice.

However, Aurora also has actual knowledge that it is dispensing controlled substances pursuant to prescriptions issued without the benefit of legitimate doctor-patient relationships because DEA Diversion Investigators notified Aurora on at least two occasions that the Internet drug orders were issued without the benefit of a legitimate physician-patient relationship, and that Aurora's Internet dispensing violated the Controlled Substances Act.

a. On July 13, 2005, DEA Diversion Investigators personally informed RPh Hyman that all prescriptions Aurora filled for its Internet business were illegal prescriptions because they were issued absent a physician-patient relationship.

b. On July 21, 2005, RPh Hyman was present during a public rulemaking hearing held by the Colorado State Board of Pharmacy. During the hearing, a DEA Group Supervisor testified that federal law proscribed Internet prescriptions that are received simply by filling out an online questionnaire and without the benefit of a physician-patient relationship.

c. On August 10, 2005, DEA Diversion Investigators visited Aurora and observed two pharmacy technicians in the Internet operations area. RPh Hyman informed the Diversion Investigators that Aurora was indeed dispensing Internet drug orders, despite the earlier notification on July 13, 2005, that it was illegal because the drug orders were issued outside legitimate physician-patient relationships, and the information gleaned from the July 21, 2005 rulemaking hearing. The Diversion Investigators again informed RPh Hyman that the Internet drug orders were illegal prescriptions and Aurora must stop filling drug orders from Internet websites. RPh Hyman finally stated that Aurora would discontinue filling Internet drug orders.

d. However, on August 16, 2005, Aurora continued to fill Internet drug orders. A DEA Diversion Investigator faxed the DEA Notice in the Federal Register regarding Internet prescribing (66 FR 21181), and orally informed RPh Hyman's husband of Aurora's responsibility to ensure that the prescriptions it fills are valid and issued pursuant to a legitimate physician-patient relationship.

4

e.  On August 23, 2005, RPh Hyman represented that Aurora stopped filling Internet drug orders on August 16, 2005.

9.  DEA has learned that Aurora received 1,172,000 dosage units of phentermine from May 1, 2005 to August 12, 2005. Phentermine is a Schedule IV controlled prescription drug which is chemically similar to amphetamine. It causes a loss of appetite and is used primarily as a short term treatment for obesity. This drug is subject to addiction and abuse because psychological dependence and tolerance develop if used over an extended period of time. Excessive use can lead to heart irregularities, toxic convulsions, and even stroke, coma, and death can occur.

10.  A review of Aurora's records revealed the following dispensing practices on May 23, 2005:

a.  Dr. Angel Acevedo-Alvarez, located in Puerto Rico, authorized 16 drug orders to Internet customers in at least 11 different states. Aurora filled these Internet drug orders despite having an invalid DEA registration number and the wrong address for Dr. Acevedo-Alvarez.

b.  Dr. Jose Sanchez-Pena, located in New Jersey, authorized 21 drug orders for Internet customers in at least 15 different states.

c.  Dr. Louis Tsarhous, located in New Jersey, authorized 25 drug orders for Internet customers in at least 14 different states.

d.  Dr. Louis Davila-Gonzalez, located in Puerto Rico, authorized 24 drug orders for Internet customers in at least 12 different states.

e.  There was no address in Aurora's records for Dr. Maximilien Espinal-Urena, yet Aurora dispensed 13 drug orders that he authorized to Internet customers in at least 11 different states.

f.  Dr. Robert Zwitiashvili, located in New Jersey, authorized 27 drug orders for Internet customers in at least 16 different states.

g.  Dr. Stephen Parker, located in South Carolina, authorized 151 drug orders for Internet customers in at least 32 different states. Aurora filled these Internet drug orders despite the fact that Dr. Parker had an invalid DEA registration number.

Based on the above, Aurora knew, or should have known, that the drug orders it dispensed were not issued in the course of legitimate physician-patient relationships, because the prescribing physicians were not located in the same states as the Internet customers, and the same physicians were issuing drug orders for numerous customers in many different states on the same day.

11. A review of Aurora's records on July 26, 2005 — after Aurora was informed that it was filling illegal drug orders — revealed the following dispensing practices:

a. Dr. Elizabeth Concepcion, located in New York, authorized 129 drug orders for Internet customers in at least 23 different states.

b. Dr. Robert Zwitiashvili authorized 105 drug orders for Internet customers in at least 24 different states.

c. Dr. Louis Davila-Gonzalez authorized 53 drug orders for Internet customers in at least 15 different states.

d. Dr. Louis Tsarhous authorized 67 drug orders for Internet customers in at least 16 different states.

e. Dr. Angel Acevedo-Alvarez authorized 47 drug orders for Internet customers in at least 15 different states.

At this point, Aurora knew that the drug orders it dispensed were not issued in the course of legitimate physician-patient relationships, because Aurora was specifically informed that the Internet orders were illegal, the prescribing physicians were not located in the same states as the Internet customers, and the same physicians were issuing drug orders for numerous customers in many different states on the same day. Despite this actual knowledge, Aurora continued to dispense controlled substances to Internet customers throughout the United States.

12. As a result of Aurora's willful blindness to its corresponding responsibility regarding the proper dispensing of controlled substances, Ms. Jodi Biondi died from "polysubstance overdose" on June 24, 2005. Aurora's records reveal that Aurora dispensed 90 tablets of carisoprodol (350 mg) to Ms. Biondi on May 23, 2005. Records reflect that the Internet website received the order on May 23, 2005, at 6:00 p.m., and it was approved by Dr. Maximilian Espina-Urena ten minutes later. Ms. Biondi's autopsy report indicates that the primary opiate present was methadone, and that the "presence of methadone in the blood is indicative of opiate use within hours preceding death." Furthermore, the presence of carisoprodol and its metabolites was confirmed, and "toxic levels of the parent compound combined with the high levels of the metabolites contributed to this woman's death." Carisoprodol is a non-controlled prescription drug that is used primarily for the treatment of musculoskeletal pain. It produces sedative effects, and may cause mild withdrawal symptoms upon abrupt cessation. Carisoprodol is subject to abuse and diversion because it heightens and prolongs the effects of other substances introduced into the body. In fact, it is commonly abused in combination with controlled substances such as hydrocodone, methadone, and alprazolam.

13. In the spring of 2005, the Kentucky General Assembly passed a law requiring Internet pharmacies to register for a permit from the Kentucky Board of Pharmacy. During the week of August 10, 2005, the Kentucky Bureau of Investigations (KBI) confiscated 58 packages of

illegally shipped prescription drugs from the Lexington FedEx Distribution Center. Some of the seized packages belonged to Aurora.

14. The aforementioned facts indicate that Aurora diverted massive amounts of controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 841(a)(2), 824(a)(4), and DEA must revoke Aurora's registration in the public interest.

In view of the foregoing, and pursuant to 21 U.S.C. § 824(d), it is my preliminary finding that Aurora has been responsible for the diversion of large quantities of controlled substances. It is my preliminary conclusion that Aurora's continued registration, during the pendency of these proceedings, would constitute an imminent danger to the public health and safety because of the substantial likelihood that Aurora will continue to divert controlled substances to drug abusers. Accordingly, pursuant to the provisions of 21 U.S.C. § 824(d) and 21 C.F.R. § 1301.36(e), and the authority granted me under 28 C.F.R. § 0.100, DEA Certificate of Registration BA9116395 is hereby suspended, effective immediately, such suspension to remain in effect until a final determination is reached in these proceedings.

Pursuant to 21 U.S.C. § 824(f) and 21 C.F.R. § 1301.36(f), the Special Agents and Diversion Investigators of the DEA who serve this Order to Show Cause and Immediate Suspension of Registration are authorized to place under seal and to remove for safekeeping all controlled substances that Aurora possesses pursuant to its registration, which I have herein suspended. The said Agents and Investigators are also directed to take into their possession the pharmacy's DEA Certificate of Registration and any unused order forms.

The following procedures are available to Aurora in this matter:

1. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, you may file with the Deputy Administrator of the Drug Enforcement Administration a written request for a hearing in the form set forth in 21 C.F.R. § 1316.47. (See 21 C.F.R. § 1301.37(d)). If you request an expedited hearing pursuant to 21 C.F.R. § 1301.36(h), such hearing will be held at 600 Army-Navy Drive, Arlington, Virginia, thirty (30) days after the date on which your written request is received by the Office of Administrative Law Judges, Drug Enforcement Administration, Washington, D.C. 20537. The date and location may be changed by the Administrative Law Judge responsible for the case, after notice and consultation with the parties, and will be fixed as early as is reasonably possible. (See 21 C.F.R. §§ 1301.36(h), 1301.43(a)).

2. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, you may file with the Deputy Administrator a waiver of hearing together with a written statement regarding your position on the matters of fact and law involved. (See 21 C.F.R. §1301.43(c)).

3. Should you decline to file a request for a hearing or should you so file and fail to appear at the hearing, you shall be deemed to have waived the hearing and the Deputy Administrator may cancel such hearing, if scheduled, and may enter her final order in this matter without a hearing

and based upon the investigative file and the record of this proceeding as it may then appear. (See 21 C.F.R. §§ 1301.43(d), 1301.43(e)).

Correspondence concerning this matter should be addressed to the Hearing Clerk, Office of Administrative Law Judges, Drug Enforcement Administration, Washington, D.C. 20537.

Michele M. Leonhart
Deputy Administrator
Drug Enforcement Administration

cc:  Hearing Clerk
     Office of Administrative Law Judges

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| APOTHECARY ARTS PHARMACY INC.<br>d/b/a AURORA COMMUNITY PHARMACY,<br>*et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CIV. NO. _____ |
| ALBERTO R. GONZALEZ, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF SUE LONGO
### Pursuant to 28 U.S.C. §1746

I, Sue Longo, do hereby declare that the following facts are true and accurate:

1.    I am a registered pharmacist, licensed in Colorado. I have been a pharmacist for 12

years. My License number is 14113.

2.    I am the sole owner of the City View Pharmacy (City View) which is located at:

1774 West 92nd Avenue, Denver, Colorado, 80260. I purchased City View in March 5,

2001 and have operated it ever since.

3.    City View holds DEA Certificate of Registration BC7177694. City View holds a retail

pharmacy license, PH # 119-05, from the State of Colorado and is authorized under state

law to dispense controlled substances.

4.    On September 21, 2005, I was served with an Order to Show Cause and Immediate

Suspension of Registration ("Show Cause Order"), a copy of which is attached hereto as

Exhibit A.

5.    The total value of the controlled substances taken by the DEA on September 21, 2005 is

$35,252.44.

6.   The loss in retail sales at my pharmacy in the 3rd quarter of 2005, as compared to 3rd quarter of 2004, were $102,608 less with a net profit loss of $38,753.   I have lost most of my customers that require controlled substances.  These losses are based on figures from my store alone and do not account for any Internet sales.

7.   DEA's press release related to the immediate suspensions resulted in negative press about City View and has caused embarrassment in dealing with customers and local physicians. In addition, I have documented fibromyalgia which is triggered by stress.  Since this incident, I am having more difficulty with this condition, and have had to curtail my hours at work.

8.   Most importantly, the Adam's Community Clinic, which treats psychiatric patients, has to send their patients to other pharmacies.  I have been working with many of these patients for over 6 years even before I bought City View.  Many of the patients have little money, and I have often helped them by paying their co-payment or forgiving bad checks.  I have heard many complaints from these patients that they are now having difficultly getting similar service elsewhere.  I also used to provide the North Metro Group Homes with their controlled substances and they have also had to send patients to other pharmacies which are farther away.

I HEREBY DECLARE under penalty of perjury that the foregoing is true and correct.

Executed on January _20_, 2006                        Sue Longo

# ATTACHMENT A



**U.S. Department of Justice**
**Drug Enforcement Administration**

---

*www.dea.gov*

Washington, D.C. 20537
SEP 1 9 2005

**IN THE MATTER OF**

City View Pharmacy
1774 W. 92nd Avenue
Federal Heights, Colorado 80260

### ORDER TO SHOW CAUSE AND
### IMMEDIATE SUSPENSION OF REGISTRATION

    **PURSUANT** to Sections 303 and 304 of the Controlled Substances Act, Title 21, United States Code, Sections 823 and 824,

    **NOTICE** is hereby given to inform City View Pharmacy ("City View") of the immediate suspension of Drug Enforcement Administration (DEA) Certificate of Registration, BC7177694, because such registration constitutes an imminent danger to the public health and safety pursuant to 21 U.S.C. § 824(d). Notice is also given to afford City View an opportunity to Show Cause before the DEA, at a place and time to be determined, as to why DEA should not revoke such registration pursuant to 21 U.S.C. § 824(a)(4), and deny any pending applications for renewal or modification of such registration pursuant to 21 U.S.C. § 823(f), for reason that continued registration is inconsistent with the public interest, as that term is used in 21 U.S.C. § 823(f) and § 824(a)(4), as evidenced by, but not limited to, the following:

    1. The Controlled Substances Act (CSA) establishes a "closed system" of distribution that regulates the movement of controlled substance prescription medications from importation or manufacture through their delivery to the ultimate user-patient via the dispensing, administering or prescribing pursuant to the lawful order of a practitioner. The regulations implementing the CSA explicitly describe the parameters of a lawful prescription as follows:

        A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

21 C.F.R. § 1306.04(a).

2. Prescriptions that are not issued in the "usual course of professional practice" are not prescriptions for purposes of the CSA, and individuals issuing and filling such purported prescriptions are subject to penalties for violating the CSA's controlled substances provisions.

3. In *United States v. Moore*, 423 U.S. 122, 141 (1975), the Supreme Court held that, "[i]mplicit in the registration of a physician is the understanding that he is authorized only to act 'as a physician'." "Acting as a physician" is acting "in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." *Id.* at 139.

4. In a traditional setting, a legitimate doctor-patient relationship usually consists of:

   a. Face-to-face evaluation of the patient by the doctor;
   b. Discussion of symptoms;
   c. Examination of the patient's current physical condition;
   d. Obtaining a reliable patient medical history and consideration of the patient's family medical history;
   e. Performance of any needed laboratory or medical tests;
   f. Proper diagnosis of the health problem and identification of underlying conditions and/or contraindications to the treatment recommended/provided;
   g. Sufficient dialogue with the patient regarding treatment options, and the risks and benefits of those treatments and the use of prescription drugs;
   h. Determination of appropriate therapy;
   i. Consideration of possible adverse side effects or drug contraindications;
   j. Prescribing of medically appropriate medications;
   k. Monitoring the efficacy of the medications prescribed and, when appropriate, re-evaluation of the diagnosis and course of treatment; and
   l. Maintenance of contemporaneous, complete and accurate medical records that are readily available to the patient and, subject to the patient's consent, to his or her other health care professionals, to facilitate patient management and care.

5. The CSA regulations create certain responsibilities not only on individual practitioners who issue prescriptions for controlled substances, but also on pharmacists who fill those prescriptions. A pharmacist's "corresponding responsibility" regarding the proper dispensing of controlled substances is explicitly described in 21 C.F.R. § 1306.04(a). It provides:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported

prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

6. The National Association of Boards of Pharmacy considers Internet pharmacies to be suspect if:

> [t]hey dispense prescription medications without requiring the consumer to mail in a prescription, and if they dispense prescription medications and do not contact the patient's prescriber to obtain a valid verbal prescription. Further, online pharmacies are suspect if they dispense prescription medications solely based upon the consumer completing an online questionnaire without the consumer having a pre-existing relationship with the prescriber and the benefit of an in-person physical examination. State boards of pharmacy, boards of medicine, the FDA, as well as the AMA, condemn this practice and consider it to be unprofessional.

http://www.nabp.net/vipps/consumer/faq.asp.

7. DEA has learned that Internet Facilitation Centers (IFCs) join illicit drug-seekers with physicians who will illegitimately prescribe controlled substances, and pharmacists who will fill sham prescriptions. Drug-seekers purchase self-selected controlled substances on Internet websites after entering their mailing and payment information, and cursory descriptive information such as their height, weight, and age. The customer's delivery address and controlled substance-of-choice is electronically forwarded to the IFC. The IFC in turn electronically provides the basic information to one of many roster physicians, who then electronically authorizes an order for the customer-selected controlled substance. No mechanism provides for face-to-face consultation between the physician and the customer, or an opportunity for medical evaluation or diagnosis. The IFCs enlist pharmacies, such as City View, to fill the electronic drug orders. Pharmacies retrieve the drug orders by electronically downloading physicians' electronic authorizations and the customers' delivery instructions. The pharmacy mails the customer-selected controlled substance to the drug-seeker via Federal Express or UPS. Once the IFC receives payment from the customer, the IFC pays the roster physician based upon the number of drug orders authorized, and the IFC pays the pharmacies based on the number of drug orders filled. A typical 90-day supply of controlled substance drug order retails on the Internet for approximately $300, of which the IFC retains approximately $200.

8. When the established safeguards of an authentic doctor-patient relationship are lacking, controlled substance prescription drugs cannot only be misused, but also present potentially serious health risks to patients. Illegally operated Internet pharmacies circumvent legitimate medical practice. A federal investigation revealed that City View dispenses controlled substances to Internet customers, despite substantial evidence that the customers do not enjoy doctor-patient relationships with the prescribing physicians. For example, City View fills numerous prescriptions that are authorized by the same physician, on the same day, for multiple Internet customers who do not reside in the state in which the physician resides; City View fills

inordinately large quantities of prescriptions per day, per physician; and the prescriptions are for disproportionate amounts of one or two types of highly addictive and abused controlled substances. These facts alone put City View on notice that it is dispensing controlled substances pursuant to prescriptions written outside the bounds of legitimate professional practice.

9. On March 4, 2005, the Colorado Board of Pharmacy conducted an inspection of City View. The inspecting pharmacist documented the following violations:

    a. Numerous stocks of controlled substances were stored next to one another on the shelves, rather than dispersed throughout the non-controlled substance stock as required by 21 C.F.R. § 1301.75(b);

    b. Compounding preparations were not dispensed pursuant to valid patient-specific prescription orders;

    c. Electronic signatures for controlled substance prescriptions were accepted in violation of 21 C.F.R. § 1306.05; and

    d. Dispensing records erroneously listed practitioners' addresses as Colorado when the practitioners were actually in Puerto Rico, in violation of 21 C.F.R. § 1306.05.

10. DEA has gained substantial information regarding City View's purchasing activities. The investigation revealed that City View orders large quantities of highly abused and addictive controlled substances from various licensed distributors. A review of the distribution records for the period January 1, 2005 through August 11, 2005, from McKesson, located in Aurora, Colorado, revealed that City View received 367,900 dosage units of Didrex. Didrex is the brand name for the Schedule III controlled substance benzphetamine. Benzphetamine is used to treat obesity because it reduces appetite. It is a stimulant that produces effects similar to amphetamines, therefore it is highly addictive and subject to abuse.

During the same period, City View received 2,142,400 dosage units of hydrocodone bitartrate and hydrocodone bitartrate combination products from McKesson. Hydrocodone is a Schedule III opiate-based controlled substance. A review of distribution records for the period May 17, 2005 to August 16, 2005, revealed that City View also received 225,000 dosage units of hydrocodone bitartrate combination products from a second supplier, Anda Pharmaceuticals, located in Groveport, Ohio.

11. Receipt of controlled substances from the above two distributors resulted in inordinate and excessive amounts of hydrocodone bitartrate in City View's inventory. For example, on June 1, 2005, City View received 10,000 dosage units of hydrocodone from both Anda and McKesson, for a total of 20,000 dosage units in a single day. One week later, on June 7, 2005, City View received 6,000 dosage units of hydrocodone from both Anda and McKesson, for a total of 12,000 dosage units in a single day. One week after that, on June 13, 2005, City View received 19,000 dosage units of hydrocodone from McKesson, and 10,000 dosage units of hydrocodone from Anda, for a total of 29,000 dosage units in a single day. Ten days later, City

View received 10,000 dosage units of hydrocodone from McKesson, and 7,500 dosage units of hydrocodone from Anda, for a total of 17,500 dosage units in a single day.

It is not customary for pharmacies located within the Denver metropolitan area to place orders for the same controlled substances, in identical strengths and package sizes, on the same date, to different distributors. Due to varying consumer demands, legitimate pharmacies carry a variety of controlled substances in various strengths, and do not deplete their stock of controlled substances as quickly as City View has depleted its stock.

12. DEA has learned that City View filled approximately 4,000 controlled substance prescriptions from mid-December, 2004 to March 4, 2005. All of these drug orders were requested by Internet customers using the following Internet websites: *www.IntegraRX.com*, *www.1stmeds.com*, and *www.medlogicRX.com*. The following six doctors authorized a majority of these drug orders: Dr. Alfred Valdivieso, Dr. Blanca Plaza, Dr. Phillip Mach, Dr. Peter Lopez, Dr. Montalvo-Carrion, and Dr. Norbert Seda Olmo. City View's records show that Drs. Valdivieso and Montalvo-Carrion practice in Puerto Rico; Drs. Plaza and Lopez practice in Tampa, Florida; Dr. Mach practices in East Brunswick, New Jersey; and Dr. Olmo practices in Alt, Colorado. However, DEA records reveal that Drs. Plaza and Olmo are registered to practice in Puerto Rico; and Dr. Lopez is not registered with DEA at all. In fact, Dr. Lopez's DEA registration expired in the 1980's.

13. According to records City View provided to the Colorado Board of Pharmacy, City View filled approximately 308 drug orders for Internet customers located throughout the United States on April 11, 2005. City View knew, or should have known, that the drug orders it dispensed were not issued in the course of legitimate physician-patient relationships, because the prescribing physicians were not located in the same states as the Internet customers, and the same physicians were issuing drug orders for numerous customers in many different states on the same day. Additionally, the majority of drug orders were for highly abused and addictive controlled substances that appeared to be prescribed without regard for the Internet customers' gender, age, weight, height, or medical condition. A review of the Internet drug orders City View dispensed on April 11, 2005, revealed the following:

       a. Dr. Plaza issued numerous drug order authorizations for Internet customers located in 19 different states, including New York, Texas, Alaska, South Carolina, Wyoming, Kentucky, Florida, California, Tennessee, Colorado, Wisconsin, and Arizona. Approximately 36 of her drug orders were for hydrocodone and alprazolam.

       b. Dr. Valdivieso issued numerous drug order authorizations for Internet customers located in 14 different states, including Tennessee, California, Georgia, Arkansas, Alabama, South Dakota, Florida, Minnesota, Texas, and New York. Approximately 20 of his drug orders were for hydrocodone, lorazepam, and alprazolam.

       c. Dr. Mach issued numerous drug order authorizations for Internet customers located in 18 different states, including Colorado, Florida, California, Arizona, Texas,

Oklahoma, Missouri, Washington, Idaho, Oregon, and Alaska. Approximately 52 of his drug orders were for phentermine, Didrex, Ambien, and Tenuate.

d. Dr. Montalvo-Carrion issued numerous drug order authorizations for Internet customers located in 29 different states, including, Alabama, Texas, Florida, Washington, California, New York, Tennessee, Virginia, Hawaii, Arkansas, Nevada, and Oklahoma. Approximately 200 of his drug orders were for phentermine, Adipex, Ambien, Bontril, and alprazolam.

14. City View's records show that the next day, April 12, 2005, it filled approximately 225 drug orders for Internet customers located throughout the United States. Again, City View knew, or should have known, that the drug orders it dispensed were not issued in the course of legitimate physician-patient relationships, because the prescribing physicians were not located in the same states as the Internet customers, and the same physicians were issuing drug orders for numerous customers in many different states on the same day. Additionally, the majority of drug orders were for highly abused and addictive controlled substances that appeared to be prescribed without regard for the Internet customers' gender, age, weight, height, or medical condition. A review of the Internet drug orders City View Pharmacy dispensed on April 12, 2005, revealed the following:

a. Dr. Plaza issued approximately 20 drug order authorizations for Internet customers located in at least 10 different states, including South Carolina, Colorado, New Jersey, Georgia, Florida, and Texas.

b. Dr. Valdivieso issued approximately five drug order authorizations for Internet customers located in Texas, New York, New Jersey, and Alabama.

c. Dr. Mach issued approximately 200 drug order authorizations for Internet customers in at least 30 different states, including California, Colorado, Oklahoma, Arizona, Nebraska, Georgia, Florida, Kansas, North Carolina, Washington, New Mexico, Alaska, Hawaii, and Oregon.

15. Records reveal that on April 19, 2005, City View dispensed approximately 111 Internet drug orders to customers located throughout the United States. Dr. Mach issued approximately 100 of these Internet drug order authorizations, which were primarily for hydrocodone, Didrex, phentermine, carisoprodol, and Ambien.

16. Records also reveal that on May 2, 2005, City View dispensed approximately 165 Internet drug orders to customers located throughout the United States. Dr. Plaza issued approximately 60 of these Internet drug order authorizations; Dr. Valdivieso issued approximately 15; and Dr. Mach issued approximately 90.

17. Records further reveal that on May 17, 2005, City View dispensed approximately 182 drug orders to Internet customers located throughout the United States. Again, City View knew, or should have known, that the drug orders it dispensed were not issued in the course of

6

legitimate physician-patient relationships, because the prescribing physicians were not located in the same states as the Internet customers, and the same physicians were issuing drug orders for numerous customers in many different states on the same day. Additionally, the majority of drug orders were for highly abused and addictive controlled substances that appeared to be prescribed without regard for the Internet customers' gender, age, weight, height, or medical condition. A review of the Internet drug orders that City View dispensed on May 17, 2005, revealed the following:

    a.  Dr. Plaza issued 14 drug order authorizations for hydrocodone and diazepam for Internet customers located in at least nine different states, including Texas, Kentucky, Alabama, Oklahoma, California, and Virginia.

    b.  Dr. Mach issued 139 drug order authorizations for phentermine, Ambien, carisoprodol, Didrex, Tenuate, phendimetrazine, Bontril, and Adipex to Internet customers in at least 23 different states, including California, Arkanasas, Texas, New York, Alabama, Florida, Washington, Georgia, Nebraska, Colorado, Nevada, and Idaho.

    c.  Dr. Tosado-Polanco, located in Puerto Rico, issued 17 drug order authorizations for hydrocodone, phentermine, and Ambien, to Internet customers in at least nine different states, including Colorado, Oklahoma, Washington, and Arizona.

    d.  Dr. Rodriguez-Escanel, also located in Puerto Rico, issued 11 drug order authorizations for phentermine and Ambien for Internet customers located in at least eight different states, including North Carolina, Kentucky, California, Arkansas, Missouri, and Kansas.

  18. A review of the Internet drug orders that City View dispensed on May 25, 2005, revealed that City View dispensed approximately 378 drug orders to Internet customers throughout the United States. Again, City View knew, or should have known, that the drug orders it dispensed were not issued in the course of legitimate physician-patient relationships, because the prescribing physicians were not located in the same states as the Internet customers, and the same physicians were issuing drug orders for numerous customers in many different states on the same day. Additionally, the majority of drug orders were for highly abused and addictive controlled substances that appeared to be prescribed without regard for the Internet customers' gender, age, weight, height, or medical condition. The records revealed the following:

    a.  Dr. Plaza issued approximately 82 drug order authorizations for Internet customers located in at least 13 different states, for generic and brand name hydrocodone, alprazolam, Valium, and carisoprodol.

    b.  Dr. Valdivieso issued approximately 104 drug order authorizations for Internet customers located in at least 22 different states, for hydrocodone, alprazolam, phentermine, carisoprodol, Tenuate, Didrex, Ambien, Bontril, and Sonata.

7

    c. Dr. Rodribuez-Escanel issued approximately 89 drug order authorizations for Internet customers located in at least 17 different states, for hydrocodone, Valium, alprazolam, phentermine, and diazepam.

    d. Dr. Ramos-Gonzales, located in Puerto Rico, issued 29 drug order authorizations for Internet customers in at least 18 different states, for hydrocodone, phentermine, diazepam, Ambien, and alprazolam.

    e. Dr. Tosado-Polanco issued 74 drug order authorizations for Internet customers in at least 18 different states, for Adipex, hydrocodone, Ultram, alprazolam, phentermine, diazepam, and Ambien.

19. Hydrocodone is the generic name of an addictive prescription painkiller that is classified under federal narcotics laws as a Schedule II controlled substance. It is classified as a Schedule III controlled substance when dispensed in amounts of not more than 15 milligrams per dosage unit when combined with other ingredients in recognized therapeutic amounts. When hydrocodone is legally prescribed for a legitimate medical purpose, it is typically used to combat acute, severe pain. Accordingly, the prescription is usually for a modest number of pills to be taken over a short period of time. Hydrocodone products are also highly abused. When used improperly, it has contributed to criminal activity (e.g., thefts from pharmacies), physical and psychological dependence, and even death. Hydrocodone abuse is particularly evident when it is combined with certain Schedule IV benzodiazepines and carisoprodol (a non-controlled drug). When these drugs are used together, they create a euphoric sensation and, in some instances, addiction among its users.

20. Diazepam, more commonly referred to by one of its brand names, Valium, is the generic name for an addictive prescription sedative and anti-anxiety agent and muscle relaxant that is classified under federal narcotics law as a Schedule IV controlled substance.

21. Phentermine and phendimetrazine are Schedule III controlled substances primarily used for the short-term treatment of obesity. These drugs have high abuse potential because their effects are similar to those of amphetamines — stimulation, loss of appetite, and mood elevation — with some of the same side effects, such as: excitability, nervousness, increased blood pressure, heart rate and respiration. However, if used to excess, serious complications may occur, including: heart irregularities, toxic convulsions, and even stroke, coma and death. Understandably, these drugs are recommended for short-term use only because extended use may lead to psychological dependence and tolerance.

22. Alprazolam is a Schedule IV benzodiazepine prescription drug that is used to treat such conditions as anxiety, depression, and panic disorder. It is marketed under then brand name Xanax in tablet and oral liquid forms. Benzodiazepines such as alprazolam have a hypnotizing mental effect and induce addiction at low levels of use.

23. The aforementioned facts indicate that City View is diverting massive amounts of controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 841(a)(2), 824(a)(4).

8

In view of the foregoing, and pursuant to 21 U.S.C. § 824(d), it is my preliminary finding that City View has been responsible for the diversion of large quantities of controlled substances. It is my preliminary conclusion that City View's continued registration, during the pendency of these proceedings, would constitute an imminent danger to the public health and safety because of the substantial likelihood that City View will continue to divert controlled substances to drug abusers. Accordingly, pursuant to the provisions of 21 U.S.C. § 824(d) and 21 C.F.R. § 1301.36(e), and the authority granted me under 28 C.F.R. § 0.100, DEA Certificate of Registration BC7177694 is hereby suspended, effective immediately, such suspension to remain in effect until a final determination is reached in these proceedings.

Pursuant to 21 U.S.C. § 824(f) and 21 C.F.R. § 1301.36(f), the Special Agents and Diversion Investigators of the DEA who serve this Order to Show Cause and Immediate Suspension of Registration are authorized to place under seal and to remove for safekeeping all controlled substances that City View possesses pursuant to its registration, which I have herein suspended. The said Agents and Investigators are also directed to take into their possession the pharmacy's DEA Certificate of Registration and any unused order forms.

The following procedures are available to City View in this matter:

1.  Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, you may file with the Deputy Administrator of the Drug Enforcement Administration a written request for a hearing in the form set forth in 21 C.F.R. § 1316.47. (See 21 C.F.R. § 1301.37(d)). If you request an expedited hearing pursuant to 21 C.F.R. § 1301.36(h), such hearing will be held at 600 Army-Navy Drive, Arlington, Virginia, thirty (30) days after the date on which your written request is received by the Office of Administrative Law Judges, Drug Enforcement Administration, Washington, D.C. 20537. The date and location may be changed by the Administrative Law Judge responsible for the case, after notice and consultation with the parties, and will be fixed as early as is reasonably possible. (See 21 C.F.R. §§ 1301.36(h), 1301.43(a)).

2.  Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, you may file with the Deputy Administrator a waiver of hearing together with a written statement regarding your position on the matters of fact and law involved. (See 21 C.F.R. §1301.43(c)).

3.  Should you decline to file a request for a hearing or should you so file and fail to appear at the hearing, you shall be deemed to have waived the hearing and the Deputy Administrator may cancel such hearing, if scheduled, and may enter her final order in this matter without a hearing and based upon the investigative file and the record of this proceeding as it may then appear. (See 21 C.F.R. §§ 1301.43(d), 1301.43(e)).

Correspondence concerning this matter should be addressed to the Hearing Clerk, Office of Administrative Law Judges, Drug Enforcement Administration, Washington, D.C. 20537.

Michele M. Leonhart
Deputy Administrator
Drug Enforcement Administration

cc:  Hearing Clerk
     Office of Administrative Law Judges

10

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTHECARY ARTS PHARMACY INC.<br>d/b/a AURORA COMMUNITY PHARMACY,<br> et al.,<br><br>                    Plaintiffs,<br><br>         v.<br><br>ALBERTO R. GONZALES,  et al.,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      CIV. NO. _____<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF DOUGLAS J. BEHR
### Pursuant to 28 U.S.C. §1746

I, Douglas J. Behr, do hereby declare that the following facts are true and accurate:

1.    I am an attorney licensed to practice law in Maryland and the District of Columbia.  I am a partner in the firm of Keller and Heckman LLP.  I serve as plaintiffs' counsel in this action.

2.    On October 25, 2005, ALJ Mary Ellen Bittner issued identical Orders for Prehearing Statements in each of Plaintiffs' cases.  A copy of Judge Bittner's Order in the Aurora matter is attached hereto as Exhibit A.  The prehearing statements were filed as ordered.

4.    On December 20, 2005, Judge Bittner scheduled a pre-hearing telephone conference for January 18, 2006.  A copy of Judge Bittner's letter is attached hereto as Exhibit B.

5.    At the January 18, 2006  telephone conference, Judge Bittner consolidated the proceedings on Plaintiffs' Show Cause Orders for the purpose of the hearing only.  A hearing on the Orders to Show Cause was scheduled for March 21 – 23, April 25 – 27 and May 23 – 25, 2006.

I HEREBY DECLARE under penalty of perjury that the foregoing is true and correct.

Executed on January 20, 2006

Douglas J. Behr

# ATTACHMENT A

## UNITED STATES DEPARTMENT OF JUSTICE
### Drug Enforcement Administration

| |
|---|
| In the Matter of |
| **Aurora Community Pharmacy** |

Docket No. 06-25

### ORDER FOR PREHEARING STATEMENTS

The undersigned administrative law judge has been duly designated as the presiding officer in the above-captioned case.

Upon consideration of the Order to Show Cause herein and of the response thereto requesting a hearing, it is

ORDERED that the Government, no later than 4:00 p.m. eastern standard time on or before November 15, 2005, and Respondent, no later than 4:00 p.m. eastern standard time on December 6, 2005, file with the Hearing Clerk, in triplicate, and serve on each other, a written statement containing the following sections:

1. **Issue(s).** Statement of the perceived issues.

2. **Stipulations.** Proposed stipulations and admissions of fact.

3. **Witnesses.** Names and addresses of all witnesses whose testimony is to be presented; counsel for Respondent should note that if an agent of Respondent intends to testify, that agent must be listed as a witness, and a summary of the testimony as described below must be provided.

4. **Summary of testimony.** Brief summary of the testimony of each witness (counsel for the Government to indicate clearly each and every act, omission or occurrence upon which she relies in seeking to revoke Respondent's DEA Certificate of Registration BA9116395 and deny any pending applications for renewal or modification; counsel for Respondent to indicate clearly each and every matter as to which he intends to introduce evidence in opposition to revocation and denial). The summaries are to state what the testimony will be rather than merely listing the areas to be covered. The parties are reminded that testimony not disclosed in the prehearing statements or pursuant to subsequent rulings is likely to be excluded at the hearing.

5. **Documents.** List of all documentary evidence, including affidavits and other exhibits to be offered in evidence, specifying the number of pages in each (Government counsel to include in her list, and submit with her prehearing statement, a copy of the Certificate of Registration that is the subject of the Order to Show Cause). Each exhibit is to be numbered or lettered with the

designation to be used at the hearing. Any exhibit of more than five pages shall have each page numbered.

6. **Other matters.** Any other matters that the parties consider relevant.

7. **Desired location.** Desired situs for hearing, with detailed statement of reasons justifying any location other than Arlington, Virginia.

8. **Best estimate as to time required for presentation of own case.**

All proceedings will be governed by the provisions of 21 C.F.R. §§ 1316.41 - 1316.68 (2005).

Respondent requested an expedited hearing in this case. The Order to Show Cause advises Respondent, "[i]f you request an expedited hearing pursuant to 21 C.F.R. § 1301.36(h), such hearing will be held at 600 Army-Navy Drive, Arlington, Virginia, thirty (30) days after the date on which your written request is received by the Office of Administrative Law Judges, Drug Enforcement Administration, Washington, D.C. 20537. The date and location may be changed by the Administrative Law Judge responsible for the case, after notice and consultation with the parties, and will be fixed as early as is reasonably possible." Counsel are advised that it is not possible to hold the hearing in this matter on November 20, 2005, thirty days from the date Respondent's request for hearing was filed in the Office of Administrative Law Judges. Consequently, the date of the hearing will be set subsequent to the filing of prehearing statements.

Dated: October 25, 2005

Mary Ellen Bittner
Administrative Law Judge

2

N.B. Attention is directed to 21 C.F.R § 1316.45 (2005) which provides that papers are "deemed filed upon receipt by the Hearing Clerk." The Hearing Clerk's address is:

> Office of Administrative Law Judges
> Drug Enforcement Administration
> Washington, D.C. 20537

Respondent's counsel is cautioned that failure to file timely a prehearing statement as directed above may be considered a waiver of hearing and an implied withdrawal of a request for hearing. Both parties are cautioned that documents are to be filed in triplicate.

### CERTIFICATE OF SERVICE

This is to certify that the undersigned on October 25, 2005, caused a copy of the foregoing to be delivered via interoffice mail to counsel for the Government, Imelda Paredes, Esq., Office of Chief Counsel, Drug Enforcement Administration, Washington, D.C. 20537, and a copy to be mailed, postage paid, to counsel for Respondent, Douglas J. Behr, Esq., Keller and Heckman LLP, 1001 G Street, NW, Suite 500 West, Washington, D.C. 20001.

Patricia A. Medico
Secretary to Mary Ellen Bittner
Administrative Law Judge

3

# ATTACHMENT B



**United States Department of Justice**

Drug Enforcement Administration
Office of Administrative Law Judges
Washington, D.C. 20537
(202) 307-8188

---

December 20, 2005

Imelda Paredes, Esq.
Office of Chief Counsel
Drug Enforcement Administration
Washington, D.C. 20537

Douglas J. Behr, Esq.
Keller and Heckman, LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001

      Re: *In the Matter of Aurora Community Pharmacy*
          Docket No. 06-25;

          *In the Matter of Lindy's Pharmacy, Nova Enterprises & Consulting d/b/a*
          *Lindy's Pharmacy, Inc.*
             Docket No. 06-26; and

          *In the Matter of City View Pharmacy*
             Docket No. 06-27.

Dear Counsel:

      This letter is to confirm that a pre-hearing telephone conference has been scheduled for Wednesday, January 18, 2006, at 10:30 a.m. eastern standard time. For convenience, we will address each of the above-referenced matters consecutively. I will call you a few minutes before 10:30 a.m. to set up the conference.

      The purpose of the pre-hearing conference is to (1) explain the ground rules and procedure of the hearing, (2) specify the issue or issues involved, (3) agree to proposed stipulations, (4) set a schedule for document production, (5) deal with any ambiguities in the proposed witness testimony, (6) decide a date, time, and place for the hearing, (7) assess the approximate duration of the hearing, and (8) clarify or address any other issues that either the judge or the parties wish to raise.

If you have any additional questions or concerns, please contact me at (202) 307-8188. Thank you for your cooperation.

Respectfully,

Nicole M. Stoduto
Law Clerk to Mary Ellen Bittner
Administrative Law Judge